UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL ANN McBRATNIE,

    Plaintiff,                      Civil Action No. 20-cv-12952
                                        HON. BERNARD A. FRIEDMAN

vs.

DENIS McDONOUGH, United
States Secretary of Veterans Affairs,

    Defendant.
_____/

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS, ACCEPTING AND ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    Introduction

    Carol Ann McBratnie commenced this employment discrimination action against the Secretary of Veterans Affairs ("VA"). She alleges that the VA unlawfully rejected her application to work as a temporary nurse practitioner after she declined to answer questions about her ability to perform the job.

    Before the Court are McBratnie's objections to Magistrate Judge Kimberly G. Altman's April 24, 2023 report and recommendation. (ECF Nos. 61, 64). The report recommends granting the VA's motion for summary judgment. (ECF No. 45). The Court will rule on the objections without oral argument pursuant to E.D.

Mich. 7.1(f)(2). For the following reasons, the Court (1) overrules McBratnie's objections, (2) accepts and adopts the April 24, 2023 report and recommendation, and (3) grants the VA's motion for summary judgment.

II. Background

　　*A.　Factual History*

McBratnie applied for a temporary nurse practitioner position with CR Associates, Inc. ("CRA") in February 2014. (ECF No. 39-3, PageID.418, Tr. 7:21). CRA contracts with the VA to provide health care services at the Department's North Texas Veterans Healthcare System, Community-Based Outpatient Clinic in Bridgeport, Texas. (ECF No. 1, PageID.29, ECF No. 39-3, PageID.490-550). CRA's representatives interviewed McBratnie and forwarded her personal information to the VA for the purpose of credentialling her to work at the Bridgeport facility. (ECF No. 39-3, PageID.409, Tr. 12:11-22; PageID.418, Tr. 8:9-18).

A VA health credentialing specialist emailed McBratnie on February 28, 2014, confirming that CRA had requested the VA to begin credentialling her for work at the Bridgeport facility. (ECF No. 39-3, PageID.473). The email attached several documents that the specialist directed McBratnie to complete and upload to a digital processing system. (*Id.*).

2

Among other things, the credentialling packet included a Declaration of Health that reads:

> I, _____, hereby declare that, to the best of my knowledge, do not have a physical or mental health condition that would adversely affect my ability to carry out the clinical privileges which I have requested from VA North Texas Health Care System.

(ECF No. 39-3, PageID.478). The section immediately below the Declaration – entitled "Confirmation of Applicant's Declaration" – requires a physician to sign and "concur with the declaration of health presented by" the applicant. (*Id.*).

McBratnie submitted some of the credentialling documents but declined to return the Declaration of Health and the Physician Confirmation. (ECF No. 45-3, PageID.1598, Tr. 43:24-44:5). McBratnie informed the VA's credentialling specialist that she would not submit the Declaration because "questions regarding my disability status could not be asked until somebody had made me an offer." (ECF No. 45-3, PageID.1599, Tr. 45:25-46:2). And when CRA's Vice President for Quality Management, Lynn Stockebrand, encouraged her to complete the forms, McBratnie reiterated her position that "the declaration of health can't be requested until someone makes me a committed job offer." (ECF No. 45-3, PageID.1606, Tr. 76:22-24). Stockebrand informed McBratnie that CRA would be "pulling her application" as a result. (ECF No. 39-3, PageID.484; ECF No. 45-3, PageID.1607, Tr. 77:12-13).

3

On March 26, 2014, Stockebrand requested that the VA "remove" McBratnie as a candidate because "she is not willing to fill out the paperwork requested for VA credentialling." (ECF No. 39-3, PageID.484). The VA terminated the credentialling process that same day. (ECF No. 39-3, PageID.418, Tr. 9:7-16; PageID.643).

B.  *Procedural History*

McBratnie filed an employment discrimination complaint with the VA on June 14, 2014. (ECF No. 39-3, PageID.300). She asserted that the Department violated section 501 of the Rehabilitation Act of 1973 when it required her to undergo a "physical assessment" before extending her a "job offer." (*Id.*; ECF No. 53-19, PageID.1842). The VA initially dismissed the complaint for lack of standing. (ECF No. 39-3, PageID.368-71). The Department concluded that (1) McBratnie sought employment with CRA, not the VA, (2) CRA was the entity that "terminated the employment process," (3) McBratnie did not have an "employee/applicant relationship for EEO purposes" with the VA, and (4) CRA and the VA did not act as joint employers. (*Id.*, PageID.369-70).

McBratnie appealed the VA's dismissal to the Equal Employment Opportunity Commission's ("EEOC") Office of Federal Operations and prevailed. (*Id.*, PageID.679-82; ECF No. 53-19, PageID.1842-50). The EEOC reversed the VA's decision, holding that McBratnie possessed the requisite standing to proceed

with her claims because the Department qualified as McBratnie's joint employer.[1] (ECF No. 53-19, PageID.1847). The Commission remanded the case to the VA for further investigation. (*Id.*). The Department provided McBratnie with its investigative report and issued her a notice of right to request a hearing before an EEOC administrative judge. (ECF No. 1, PageID.30).

McBratnie requested that hearing and the parties cross-moved for summary judgment. (*Id.*). The administrative judge sided with the VA, finding that the Department did not engage in discrimination when it terminated the credentialling process. (*Id.*). McBratnie again appealed to the EEOC's Office of Federal Operations. (*Id.*). The EEOC affirmed the administrative judge, concluding that "the preponderance of the evidence did not establish that Complainant was discriminated against by the Agency as alleged." (*Id.*, PageID.32).

McBratnie then filed this lawsuit, alleging causes of action under the Americans with Disabilities Act of 1990 and section 501 of the Rehabilitation Act.

---

[1] The VA does not challenge the EEOC's joint employer determination although it could have. *See Haskins v. United States Dep't of Army*, 808 F.2d 1192, 1199 n.4 (6th Cir. 1987); *see also Morris v. Rumsfeld*, 420 F.3d 287, 294 (3d Cir. 2005) ("We hold that, when a federal employee comes to court to challenge, in whole or in part, the administrative disposition of his or her discrimination claims, the court must consider those claims *de novo*, and is not bound by the results of the administrative process . . ."); *Ellis v. England*, 432 F.3d 1321, 1324-25(11th Cir. 2005) (endorsing *Morris*); *Timmons v. White*, 314 F.3d 1229, 1234 (10th Cir. 2003) (holding that "a federal employer is not bound by a prior adverse finding by the EEOC" when a federal employee seeks *de novo* review of the EEOC's discrimination decision).

(*Id.*, PageID.4). The VA now moves for summary judgment on both claims. (ECF No. 45).

III. <u>Legal Standards</u>

A moving party is entitled to summary judgment where the "materials in the record" do not establish the presence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c). All the evidence, along with all reasonable inferences, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

IV. <u>Analysis</u>

    *A.    Statutory Overview*

A good deal of conceptual housekeeping is in order before addressing the pertinent statutory authorities. Consider first the Americans with Disabilities Act ("ADA").

Without question the ADA claim is improper. The Rehabilitation Act is a federal employee's exclusive avenue to remedy disability-based employment discrimination. *See* 42 U.S.C. § 12111(5)(B) (defining employers under the ADA and excluding the United States or a corporation wholly owned by the United States government as a covered employer); *see also Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004) ("the Rehabilitation Act . . . provides the remedy for federal employees alleging disability discrimination"). So for the sake of analytic

6

clarity, the Court will construe the ADA claim as a Rehabilitation Act claim and read the complaint to allege a single cause of action under section 501 of that statute.[2] *See Plautz v. Potter*, 156 F. App'x 812, 816 (6th Cir. 2005) (deeming pro se federal employee's ADA claim as a Rehabilitation Act claim).

Evaluating McBratnie's allegations under the Rehabilitation Act will in no way change the outcome of this litigation. Both statutes "share the same substantive standard[s]." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007); *see also Doe v. Salvation Army in the United States*, 531 F.3d 355, 357 (6th Cir. 2008) ("We review claims brought under the Rehabilitation Act as we would claims brought under the Americans with Disabilities Act of 1990."). The Rehabilitation Act expressly provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) . . ." 29 U.S.C. § 791(f). Construing the ADA claim as a Rehabilitation Act claim, therefore, "does not significantly alter the legal analysis" governing this case. *Plautz*, 156 F. App'x at 816.

---

[2] The VA did not move to dismiss the ADA claim on this ground. *See Grose v. Lew*, No. 15-5357, 2016 U.S. App. LEXIS 24454, at *7 (6th Cir. Sep. 21, 2016) (dismissing *pro se* federal employee's ADA claim because "the Rehabilitation Act is the exclusive remedy for a federal employee alleging disability discrimination").

Looking to the ADA as a substantive gap-filler (as this Court must), the statute prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To advance this goal, the statute restricts employers from requiring medical inquiries and examinations during the hiring process. 42 U.S.C. § 12112(d). These restrictions vary in degree – from most restrictive to least restrictive – among three categories: (1) pre-offer job applicants, (2) post-offer candidates, and (3) current employees.³ 42 U.S.C. § 12112(d)(2)-(4).

*Pre-Offer Job Applicants*. The type of inquiries prospective employers may pose to pre-offer job applicants are the most limited. Employers may not (1) compel pre-offer job applicants to undergo medical examinations, (2) ask them whether they have a disability, or (3) inquire into "the nature or severity of such disability." 42 U.S.C. § 12112(d)(2)(A); *see also* 29 C.F.R. § 1630.13(a). But employers may ask about an applicant's ability "to perform job-related functions." 42 U.S.C. § 12112(d)(2)(B); *see also* 29 C.F.R. § 1630.14(a). And they may ask applicants to "describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions." 29 C.F.R. § 1630.14(a).

---

³ "[D]isability is not an element of a § 12112(d) claim." *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 813 n.6 (6th Cir. 2012); *see also Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011).

*Post-Offer Candidates*. Prospective employers are moderately restricted when imposing conditions of employment on post-offer candidates. Employers may require post-offer candidates to undergo medical examinations before starting a job – "and may condition an offer of employment on the results" of those examinations – so long as "all entering employees are subjected to such an examination regardless of disability." 42 U.S.C. § 12112(d)(3)(A); *see also* 29 C.F.R. § 1630.14(b).

*Employees*. Finally, employers are least restricted when obtaining information from employees. Employers may require "a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity." 29 C.F.R, § 1630.14(c); *see also* 42 U.S.C. § 12112(d)(4)(A). They may also ask about the "ability of an employee to perform job-related functions." 29 C.F.R, § 1630.14(c); *see also* 42 U.S.C. § 12112(d)(4)(B).

Employing the above framework, the Court must decide how best to classify McBratnie.

B. *CRA Never Offered McBratnie the Temporary Nursing Position*

The parties duel over whether CRA actually offered McBratnie the temporary nurse practitioner job – a question that determines the scope of the inquiry or medical examination the VA could demand from McBratnie before starting the position. The VA maintains that CRA offered McBratnie the job,

9

subject to her completing the VA credentialing process. (ECF No. 45, PageID.1581-82; ECF No. 57, PageID.2086-88). McBratnie argues that CRA never extended her an offer, whether conditional or otherwise. (ECF No. 53, PageID.1674-75; ECF No. 60, PageID.2197). The record supports McBratnie on this score.

Pursuant to its contract with the VA, CRA assumed the responsibility for credentialing "registered professional nurses and nurse practitioners" consistent with VHA Handbook 1100.19.[4] (ECF No. 39-3, PageID.519; *see also* PageID.412, Tr. 23:1-3). That handbook specifically provides that "medical staff and employment commitments must not be made until the credentialling process is completed." (ECF No. 53-6, PageID.1716).

Representatives from both CRA and the VA further confirmed that the company did not tender employment offers until applicants completed the VA's credentialing process. (ECF No. 39-3, PageID.430, Tr. 4:24-5:2, 15-16 ["So our HR would extend an offer and that's if they make it through credentialling. So once they're credentialled we make a final offer."] ["we cannot hire anyone who cannot get credentialed."]; *id.*, PageID.410, Tr. 16:19-20 ["she's offered the

---

[4] The contract misprinted the VHA Handbook number as "1100.9." (ECF No. 39-3, PageID.519). The parties agree that the correct handbook number is "1100.19." (ECF No. 45-5, PageID.1633; ECF Nos. 53-6 & 53-7, PageID.1716-17).

10

position upon credentialling, . . . if her completion is satisfactory."]; *id.*, Page ID.418, Tr. 6:23-7:17).

And most importantly, there is no evidence that CRA ever tendered McBratnie an offer of employment, whether on a preliminary, conditional, or final basis. Once McBratnie declined to submit the Declaration of Health and the Physician Confirmation, CRA's representatives not once mentioned rescinding an *offer* of employment. Instead, CRA requested that the VA "remove" McBratnie as a candidate. (ECF No. 39-3, PageID.484). And CRA's Vice President for Quality Management informed McBratnie that CRA was "pulling her application" – not withdrawing some form of conditional offer. (*Id.*, ECF No. 45-3, PageID.1607, Tr. 77:12-13).

Because CRA never offered McBratnie the temporary nursing position, the VA's credentialling process had to comport with the ADA's limitations on pre-offer medical inquiries and examinations.

### C. *The Declaration of Health and Physician Confirmation Do Not Violate the Rehabilitation Act*

Since both CRA and the VA required McBratnie to complete the VA's credentialling process at the pre-offer stage, the dispositive question is whether the Declaration of Health, together with the Physician Confirmation, constitute a permissible preemployment inquiry or an unlawful medical examination. *See* 42 U.S.C. § 12112(d)(2).

Consulting the ADA yet again, the statute's plain text and legislative history shed little light on the meaning and scope of the term "medical examination." *See Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012). The most helpful interpretive resource is the EEOC's Enforcement Guidance on Preemployment Disability-Related Questions and Medical Examinations. Equal Opportunity Employment Commission, Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations (Oct. 10, 1995), https://www.eeoc.gov/laws/guidance/enforcement-guidance-preemployment-disability-related-questions-and-medical ("EEOC Guidance"). The agency's guidance, "while nonbinding, constitutes a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Kroll*, 691 F.3d at 815 (cleaned up). And the Sixth Circuit Court of Appeals views this guidance as "very persuasive" when interpreting the ADA. *Id.*, *see also Lee v. City of Columbus*, 636 F.3d 245, 256 (6th Cir. 2011).

Turning to the guidance manual, the EEOC defines "medical examination" as a "procedure or test that seeks information about an individual's physical or mental impairments or health." EEOC Guidance. The manual delineates the following eight-factors to ascertain whether a test or procedure is a "medical examination":

> (1) whether the test is administered by a health care professional or someone trained by a health care professional;
>
> (2) whether the results are interpreted by a health care professional or someone trained by a health care professional;
>
> (3) whether the test is designed to reveal an impairment or physical or mental health;
>
> (4) whether the employer is trying to determine the applicant's physical or mental health or impairments;
>
> (5) whether the test is invasive (for example, does it require the drawing of blood, urine or breath);
>
> (6) whether the test measures an applicant's performance of a task or the applicant's physiological responses to performing the task;
>
> (7) whether the test is normally given in a medical setting (for example, a health care professional's office); and
>
> (8) whether medical equipment is used.

*Id.*

Both the Declaration of Health and the Physician Confirmation fall well outside the boundaries of a "medical examination." They are neither "procedures" nor "tests" that are employed to assess the job applicant's "physical or mental impairments or health." *Test*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/test (last visited Apr. 30, 2023) (defining "test" as "a diagnostic procedure for determining the presence or nature of a condition or

13

disease or for revealing a change in function."). And even if the Declaration and Confirmation somehow met this definition, they do not remotely satisfy any one of the EEOC's "medical examination" factors.

Still, a lingering issue persists. Although the Physician Confirmation does not qualify as a prohibited "medical examination" it could perhaps "necessitate" one. *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 676 (1st Cir. 1995) ("We conclude that a certification from a treating psychiatrist that does not *necessitate new tests or procedures* is best analyzed as an 'inquiry' rather than as a 'medical examination.'") (emphasis added).

To resolve this concern, courts must assess whether the physician or the employer is directing the applicant to undergo the "new test or procedure." *Id.* Here, while doctors may exercise their own discretion and refuse to sign the Physician Confirmation without performing "new tests or procedures," the VA *does not mandate* that level of clinical verification before the physician confirms the Declaration of Health. (ECF No. 45, PageID.1581 [stating that, according to the VA, the "confirmation did not require any specific testing or performance metrics . . ."]). Because the Physician Confirmation *does not require* the certifying doctor to perform any "new tests or procedures," it is more appropriately viewed as an "inquiry" rather than a "medical examination." *Grenier*, 70 F.3d at 676.

The question remains whether the Declaration and Confirmation pose content-appropriate inquiries. As noted previously, employers may ask job applicants about their ability "to perform job-related functions," 42 U.S.C. § 12112(d)(2)(B), and to "describe or . . . demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions." 29 C.F.R. § 1630.14(a).

The Declaration of Health requires applicants to affirm that they "do not have a physical or mental health condition that would adversely affect [their] ability to carry out the clinical privileges . . . requested from" the VA. (ECF No. 39-3, PageID.478). This language fits neatly within the ADA's limitations on pre-offer medical inquiries. And since employers may ask any question of a third-party that they could otherwise pose to the applicant directly, the Physician Confirmation – which simply asks the doctor to "concur with the declaration of health" – passes muster under the ADA as well. (ECF No. 45-4, PageID.1632). EEOC Guidance; *see also Grenier*, 70 F.3d at 676 (holding that "an employer may request that an applicant provide medical certification from doctors of ability to perform so long as the inquiry does not otherwise run afoul of § 12112(d)(2)(A).").

Because the Declaration of Health and the Physician Confirmation comply with the ADA's limitations on pre-offer medical inquiries and examinations,

15

McBratnie's Rehabilitation Act claim cannot withstand summary judgment. Accordingly,

IT IS ORDERED that McBratnie's objections to the April 24, 2023 report and recommendation (ECF No. 64) are overruled.

IT IS FURTHER ORDERED that the April 24, 2023 report and recommendation (ECF No. 61) is accepted and adopted.

IT IS FURTHER ORDERED that the VA's motion for summary judgment (ECF No. 45) is granted.

**SO ORDERED.**

                                                                  s/Bernard A. Friedman
                                                                  Hon. Bernard A. Friedman
Dated: May 9, 2023              Senior United States District Judge
       Detroit, Michigan